**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 1:25-CR-20261-CMA**

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

**v.**

**CUTTER MURRAY,**

     **Defendant.**

_____/

**DEFENDANT'S SENTENCING MEMORANDUM**
**AND REQUEST FOR A REASONABLE SENTENCE**

Defendant, **CUTTER MURRAY** ("**Mr. Murray**" or "**Cutter**"), by and through undersigned counsel, and pursuant to 18 U.S.C. § 3553(a), hereby files this Sentencing Memorandum and moves this Court to impose a reasonable sentence, all facts and circumstances considered.

### I.      **INTRODUCTION**

On June 11, 2025, Mr. Murray was charged by Information with one (1) count of money laundering, in violation of 18 U.S.C. § 1957(a) (Count 1). (D.E. 1). On September 25, 2025, Mr. Murray pled guilty to Count 1 of the Information. (D.E. 9). Sentencing is set for December 12, 2025. (D.E. 14).

Given the mitigating factors set forth herein, Mr. Murray respectfully requests that the Court impose a reasonable sentence below the advisory guideline range that is sufficient—but not greater than necessary—to satisfy the factors outlined in 18 U.S.C. § 3553(a). See Kimbrough v. United States, 552 U.S. 85, 101 (2007).

## II.      ADVISORY GUIDELINES CALCULATIONS

### A.      UNCONTESTED GUIDELINE PROVISIONS

U.S.S.G. § 2S1.1 is the applicable guideline for violations of 18 U.S.C. § 1957. The base offense level begins at eight (8) and subsequently increases based on the value of the laundered funds using the table found in U.S.S.G. § 2B1.1(b)(1). See U.S.S.G. § 2S1.1(a)(2). The parties agree that a sixteen (16)-level increase is appropriate because the value of the laundered funds is $1,605,259.25. See U.S.S.G. § 2B1.1(b)(1)(I); see also Plea Agreement at ¶ 9. (D.E. 11). Likewise, another one (1)-level enhancement is applicable since Mr. Murray was convicted of violating 18 U.S.C. § 1957. See U.S.S.G. § 2S1.1(b)(2)(A); see also Plea Agreement at ¶ 9. (D.E. 11).

Pursuant to U.S.S.G. § 3E1.1(a), the offense level should be reduced by two (2) points based on Mr. Murray's acceptance of responsibility. See Plea Agreement at ¶ 6. (D.E. 11). The Government has also agreed to file a motion requesting an additional one (1)-level decrease to the base offense level under U.S.S.G. § 3E1.1(b), due to Mr. Murray's assistance and timely cooperation with the investigation of his misconduct. Id. Thus, Mr. Murray and the Government agree that at a minimum, the adjusted offense level should be twenty-two (22). As discussed below, both Mr. Murray and the Government have objected to the United States Probation Office's application of a two (2)-point vulnerable victim enhancement under U.S.S.G. § 3A1.1(b)(1).

### B.      INAPPLICABILITY OF THE VULNERABLE VICTIM ENHANCEMENT

Mr. Murray objects to the U.S. Probation Office's application of the two (2)-level vulnerable victim enhancement under U.S.S.G. § 3A1.1(b)(1) to increase his offense level, and as discussed below, submits that it is inapplicable for several reasons.

U.S.S.G. § 3A1.1(b)(1) provides for a two-point increase to a defendant's total offense level if he knew or should have known that a victim of the offense was a "vulnerable victim." A

"vulnerable victim" is one who "(A) is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is **unusually** vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." See U.S.S.G. § 3A1.1 cmt. n.2. (emphasis added).

As such, the vulnerable victim enhancement is appropriate where the defendant **knew** the victim had unique characteristics that made the victim more vulnerable to the specific crime than other potential victims of the crime. See United States v. Smith, 853 F. App'x 589, 595–96 (11th Cir. 2021) (citing United States v. Pierre, 825 F.3d 1183, 1195–96 (11th Cir. 2016)); see also United States v. Phillips, 287 F.3d 1053, 1056–57 (11th Cir. 2002) ("The applicability of the 'vulnerable victim' enhancement must be determined on a case-by-case basis, and is appropriate where the defendant **knows** that the victim has 'unique characteristics' that make the victim more vulnerable to the crime than other potential victims of the crime.") (emphasis added); United States v. Moran, 778 F.3d 942, 978 (11th Cir. 2015) (explaining that the vulnerable victim enhancement applies when a defendant selected his victim to take advantage of that victim's perceived susceptibility to the offense); but see United States v. Birge, 830 F.3d 1229, 1233 (11th Cir. 2016) (stating that evidence that a defendant "targeted" a vulnerable victim is not required for the enhancement under U.S.S.G. § 3A1.1(b)(1) to apply). In this analysis, the focus is on the defendant's perception of the victim's vulnerability to the offense. See Phillips, 287 F.3d at 1057.

The Government's position is that the vulnerable victim adjustment was not contemplated in the Plea Agreement, and that, among other things, Mr. Murray's conduct is far afield from the victims in this matter, which makes his situation distinguishable from other defendants that may typically receive such an enhancement.

3

Unlike his father Troy, Mr. Murray did not participate in the underlying lottery fraud scheme in any capacity – he did not select any of the victims, did not assist in compiling lead lists, did not contact/speak with any victims, and never learned who the victims were. Instead, Mr. Murray's role in the offense was limited to receiving and depositing Troy Murray's illicit proceeds gained from brokering lead lists to the perpetrators of the lottery fraud scheme. Given his lack of involvement in the underlying lottery fraud scheme, Mr. Murray did not know about any "unique characteristics" that made some of the victims more susceptible to the crime.

In addition, the fact that some of the scheme's victims were elderly is not, by itself, sufficient for application of the vulnerable victim enhancement pursuant to U.S.S.G. § 3A1.1(b)(1). Although it appears the Eleventh Circuit Court of Appeals has not directly addressed this issue, the Courts of Appeals for the Eighth and Tenth Circuits have previously held that class membership (including belonging to a certain age group) without more, cannot justify an enhancement under U.S.S.G. § 3A1.1(b)(1). See United States v. Lee, 973 F.2d 832, 835 (10th Cir. 1992) ("The label 'elderly,' like the label 'young,' is too vague, standing alone, to provide the basis for a finding of unusual victim vulnerability. The use of § 3A1.1 to enhance a defendant's punishment…requires analysis of the victim's personal or individual vulnerability.") (internal citation omitted); United States v. Vega-Iturrino, 565 F.3d 430, 434 (8th Cir. 2009) (explaining that the Court, when determining whether the vulnerable victim enhancement is warranted, does not "apply a blanket assumption that an advanced age is sufficient to render a victim vulnerable.").

In United States v. White, 848 F. App'x 830 (11th Cir. 2021), the Eleventh Circuit Court of Appeals seemingly acknowledged the idea that there must be some additional factor besides a victim's age to consider them "vulnerable" for purposes of the enhancement under U.S.S.G. § 3A1.1(b)(1). In White, the appellate court explained that age, **in combination with** the repeated

4

targeting of victims, a practice called "reloading," constitutes evidence that the defendant knew the victim was particularly vulnerable to the fraud scheme. See White, 848 F. App'x at 846. Thus, even if Mr. Murray had a minimal indication that some (or even all) of the victims of the lottery fraud scheme were elderly, his lack of involvement in the specified unlawful activity means that he did not have any knowledge that would lead him to believe the victims were "unusually vulnerable" to the crime due to their advanced age.

As such, Mr. Murray respectfully requests that the Court sustain his objection to application of the vulnerable victim enhancement.

**C.      THE ZERO-POINT OFFENDER ADJUSTMENT**

Should the Court agree with the parties' position that the vulnerable victim enhancement under U.S.S.G. § 3A1.1(b)(1) is inapplicable, Mr. Murray would also be eligible to receive an additional two (2)-point reduction to his offense level as a "zero-point offender." See U.S.S.G. § 4C1.1(a).

**D.      TOTAL OFFENSE LEVEL**

Assuming the Court sustains Mr. Murray's objection to application of the vulnerable victim enhancement under U.S.S.G. § 3A1.1(b)(1), and grants a two (2)-point reduction to his offense level pursuant to U.S.S.G. § 4C1.1(a), Mr. Murray's total offense level would be twenty (20). A criminal history category of I and total offense level of 20 produces an advisory guidelines range of thirty-three (33) to forty-one (41) months' imprisonment. However, as further detailed below, several mitigating factors support a much lower, more reasonable sentence.

### III.      APPLICATION OF THE 18 U.S.C. § 3553(a) FACTORS

As this Court well knows, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." Nelson v. United States, 555 U.S. 350, 352

(2009); see also Gall v. United States, 552 U.S. 38, 39 (2007) (a district judge "**may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented**") (emphasis added).  "The corollary of that proposition is that district judges have an obligation to consider whether a sentence other than a Guidelines sentence would be sufficient, but not greater than necessary, to serve the purposes of sentencing" under 18 U.S.C. § 3553(a).  See United States v. Corsey, 723 F.3d 366, 382 (2d. Cir. 2013) (Underhill, J., concurring).

At Sentencing, 18 U.S.C. § 3553(a) obliges the Court to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, protect the public, and provide the defendant with needed educational or vocational training and medical care; (3) the kinds of sentences available; (4) the applicable advisory sentencing guidelines range; (5) pertinent Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims.

See 18 U.S.C. § 3553(a)(1)–(7).

Mr. Murray respectfully asks this Court to look beyond the advisory sentencing guidelines range, focus on the principles delineated by the United States Supreme Court and the applicable factors set forth in 18 U.S.C. § 3553(a), and thereafter impose a fair, just, and reasonable sentence.

A.    **MR. MURRAY'S PERSONAL HISTORY AND CHARACTERISTICS**

Congress has directed that a defendant's personal characteristics should be considered equally with "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). Yet these factors are given no weight in the guideline calculation. Indeed, the guidelines recognize only the defendant's criminal record (providing for higher offense levels for a greater criminal history, rather than reductions for no prior record). See Rita v. United States, 551 U.S. 338, 364–65 (2007)

6

("The Commission has not developed any standards or recommendations that affect sentencing ranges for many individual characteristics. Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civil, charitable, or public service are. . . matters that § 3553(a) authorizes the sentencing judge to consider."); see also United States v. Prosperi, 686 F.3d 32, 39, 45 (1st Cir. 2012) (affirming a downward variance from an advisory guideline range of 87–108 months to home detention because the guidelines did not take into account the defendant's personal characteristics). Mr. Murray respectfully asks that the Court balance the advisory sentencing guideline calculations by considering his personal history and characteristics that weigh in favor of a below-guidelines sentence.

Cutter Murray was born in Scottsdale, Arizona on November 20, 1989. He is the son of Troy Murray and Sharen Lingscheit, and one of five (5) siblings. Cutter's parents divorced when he was five (5) years old, and he was raised in South Dakota by his mother. Growing up, Cutter never had a strong relationship with his father Troy, who lacked a stable career and was consistently absent for large parts of Cutter's life. On the other hand, Cutter was close with his mother, who worked as a farmhand on her second husband's ranch, as a part-time bookkeeper, and was also a homemaker. Although Cutter's basic needs as a child were met, the family always struggled financially (an issue that would later repeat itself in Cutter's life).

Due to their economic circumstances, everyone in Cutter's family worked to help support the household. Between the ages of fourteen (14) and sixteen (16), Cutter worked as a bagger at his local grocery store, "Tucker's Supervalu Foods," in Miller, South Dakota. After turning sixteen (16), Cutter worked multiple seasonal jobs, cleaning game at a hunting lodge during the winters

and working as a groundskeeper and announcer at a nearby racetrack in the summers. Throughout this time, Cutter would give his mother money from his paychecks to help cover family expenses.

After graduating from high school in 2008, Cutter attended Lake Area Technical College in Watertown, South Dakota, where he obtained an Associate's Degree in Marketing and Management in 2010. Shortly thereafter, Cutter began working in the agricultural industry as a general laborer for the Wheat Growers Cooperative, a grain elevator. Between 2010 and 2018, Cutter worked his way up through various positions at the Wheat Growers Cooperative, eventually becoming a "grain marketer" responsible for grain procurement, client relationship management, and development of marketing strategies for clients' (i.e., farmers') grain sales. In 2018, Cutter started working for his present employer, Dakota Mill & Grain, Inc. (another grain elevator), as a "grain originator" performing substantially the same duties that he had in his prior role. Outside of the commercial agriculture business, Cutter also pursued his childhood dream of becoming a professional auctioneer. In 2022, Cutter obtained his auctioneering certification from the Western College of Auctioneering in Bozeman, Montana after completing a 130-hour course.

Apart from his professional life, Cutter has also made an effort to give back to his community. Last year, Cutter helped raised $60,000.00 to benefit a young woman with brain cancer by volunteering as an auctioneer for a charity auction event in his hometown. In addition, Cutter has worked as a volunteer auctioneer at events for Ducks Unlimited, an environmental conservation group, as well as a volunteer announcer for local youth wrestling matches.

More than anything, Cutter's greatest personal achievement is being a devoted husband and father. He has been with his now-wife, Heather, since 2013, and the pair share two young children: Ivy, who is nine (9)years old, and Finley, who is four (4) years old. Given his complicated relationship with his own father when growing up, Cutter has always tried his best to be a

supportive, loving, and present parent in his children's lives. He hopes that by acknowledging his wrongdoing, he will set a positive example for his children and demonstrate the importance of accepting responsibility for one's actions.

Cutter recognizes that it may be difficult to understand how/why a humble, hardworking, "family man" found himself in this situation. Troy Murray presented Cutter with the chance to earn extra money when Cutter was going through a time of financial need. Unfortunately, Cutter decided to accept proceeds from his father's illicit list-brokering activities and deposit same at his father's direction, in exchange for a small portion of the funds. In 2015, Cutter stopped taking money from Troy after being visited by U.S. Postal Inspectors and learning about the criminal nature of his father's business. However, in 2018, Cutter again found himself facing difficult financial circumstances at a time when he was also caring for, sheltering, and economically supporting his youngest brother Chance, who struggled with substance abuse. Regrettably, Cutter made the wrong choice in the face of the financial pressure he faced, and he started accepting funds from Troy's list-brokering activities again. Cutter is not offering this information as an excuse for his conduct, but rather as a partial explanation for same.

Cutter recognizes the seriousness of his offense and that money laundering is not a victimless crime. He is ashamed and remorseful for the harm his actions have caused, and also for the suffering his decisions have caused his family. However, Cutter respectfully requests that the Court not view or define him solely based on the conduct at issue here. Instead, Cutter asks the Court to consider who he is as a person—a proud father, loving husband, loyal brother and friend, and so much more. Cutter is a kind, caring, and good-hearted person who made the worst decision of his life, and he is remorseful for having done so.

In its remarks on the effect of incarceration on first-time, nonviolent offenders, the First Circuit in Prosperi recognized the punishment inherent to those who are thrust into the criminal justice system:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed.

686 F.3d at 48. Mr. Murray urges the Court to take his personal characteristics and life history into account when determining his sentence.

**B.      MR.      MURRAY'S      EARLY      ACCEPTANCE      OF      RESPONSIBILITY**

One of the goals of sentencing is rehabilitation. See Williams v. New York, 337 U.S. 241, 248 (1949). A defendant's admission of responsibility or expression of contrition "is often a significant first step towards his rehabilitation and, for that reason, deserving of a possible reward in the form of a lessened sentence." Smith v. Wainwright, 664 F.2d 1194, 1196 (11th Cir. 1981). Furthermore, "[a] sentencing court has the power to consider a defendant's cooperation under § 3553(a), irrespective of whether the Government files a § 5K1.1 motion"). United States v. Robinson, 741 F.3d 588 (5th Cir. 2014); see also United States v. Landrón Class, 696 F.3d 62 (1st Cir. 2012); United States v. Massey, 663 F.3d 852 (6th Cir. 2011); United States v. Leiskunas, 656 F.3d 732 (7th Cir. 2011); United States v. Doe, 398 F.3d 1254 (10th Cir. 2005).

Unlike defendants who do not acknowledge their wrongful behavior, Mr. Murray fully accepted responsibility for his actions at issue here. He has openly and honestly disclosed information relating to his offense, and he understands that there is no excuse for his conduct.

10

However, Mr. Murray hopes that the Court sees he is truly remorseful for what he has done and that he is committed to never reoffending again.

Mr. Murray respectfully requests that the Court consider his complete acceptance of responsibility, in conjunction with the other mitigating factors detailed herein, as grounds for a variance below the advisory guideline range. See Roberts v. United States, 445 U.S. 552, 558 (1980) (stating a defendant's cooperation demonstrates that the defendant "will transgress no more…respond to rehabilitative efforts…[and] not deem himself at war with his society.").

**C.      U.S.S.G. § 2B1.1'S OUTSIZED IMPACT ON THE ADVISORY GUIDELINE RANGE**

In Pepper v. United States, 562 U.S. 476, 488, 131 S. Ct. 1229, 1240 (2011), the Supreme Court emphasized the need for individualized sentencing, reiterating "the principle that the punishment should fit the offender and not merely the crime." (internal quotation omitted); see also Miller v. Alabama, 567 U.S. 460, 470 (2012) ("punishment for crime should be graduated and proportioned to both the offender and the offense"). While the underlying lottery fraud scheme was undoubtedly serious, Mr. Murray's conduct was limited to receiving illicit proceeds generated from Troy Murray's participation in the scheme, and thereafter following his father's instructions/directions on how to allocate the funds. As such, Mr. Murray respectfully suggests that U.S.S.G. § 2B1.1's loss table has played an oversized role in determining his advisory sentencing guideline range.

The reach of U.S.S.G. § 2B1.1 extends to over three hundred federal criminal statutes. See "The Trial Penalty: The Sixth Amendment Right to Trial on the Verge of Extinction and How to Save It," National Association of Criminal Defense Lawyers (2018) at 33.[1] U.S.S.G. § 2B1.1 is

---

[1] Available at: www.nacdl.org/trialpenaltyreport

one of the most pervasive guidelines in the federal criminal justice system that "was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." See Corsey, 723 F.3d at 379 (2d. Cir. 2013) (Underhill, J., concurring).

The United States Sentencing Commission has acknowledged that "as more and more adjustments are added to the sentencing rules, it is increasingly more difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness." See "Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform," United States Sentencing Commission (November 2004) at 137–38[2]; see also United States v. Lamonda, 2008 U.S. Dist. LEXIS 178, 66 (M.D. Fla. 2008) (citation omitted) aff'd 384 Fed. Appx. 944 (11th Cir. 2010) ("The Guidelines themselves acknowledge that the offense level resulting from the loss determination may 'substantially overstate the seriousness of the offense' warranting a downward departure.").

Sentence enhancements based on loss (or as is the case here, the amount of laundered funds) do not comport with the Congressional directives of 18 U.S.C. §3553(a), because emphasis on loss discounts the importance of other relevant factors a sentencing judge is obligated to consider. See Douglas A. Berman, Fiddling with the Fraud Guidelines as Booker Burns, 27 FED. SENT'G REP. 267, 268 (2015). "Ultimately, '[t]he touchstone of "reasonableness" is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." United States v. Tomko, 562 F.3d 558, 568 (3d. Cir. 2009) (citation omitted).

---

[2]  Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf

For far too long, the draconian guideline ranges produced by U.S.S.G. § 2B1.1—which are largely driven by a single variable (loss amount involved)—have unjustly recommended incarcerative sentences for people who do not deserve them. Mr. Murray asks that the Court consider the disproportionate impact that § 2B1.1's loss table has had on his advisory guideline range as it decides whether a below-guidelines sentence is appropriate.

## D.    MR. MURRAY'S LOW RISK OF RECIDIVISM

In 2004, the Federal Sentencing Commission published a report that presented a statistical analysis of the characteristics associated with the likelihood of a person recidivating. The study found that: (1) those sentenced under economic crime guidelines were less likely to recidivate than those sentenced under other guidelines; (2) older individuals were less likely to reoffend; (3) first-time offenders were less likely to recidivate than repeat offenders; (4) those who were employed were less likely to recidivate than those who were unemployed; (5) non-drug users were less likely to recidivate than drug users; (6) college graduates were significantly less likely to reoffend than those with lower levels of educational attainment; and (7) people who received non-incarcerative sentences were less likely to reoffend than those who received sentences involving incarceration. See "Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines," United States Sentencing Commission (May 2004) at 28-32.[3] These factors, together with Mr. Murray's personal characteristics, strongly support a finding that he poses no risk of reoffending.

In United States v. Clay, 483 F.3d 739, 746 (11th Cir. 2007), the Eleventh Circuit affirmed the district court's downward variance to sixty (60) months' imprisonment from the defendant's

---

[3]  Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf

advisory guideline range of 188 to 235 months imprisonment, in part because the defendant had "fundamentally changed since his offense" and "pose[d] a lesser risk to the community."

Mr. Murray's involvement in the offense conduct ended in November of 2023 when he stopped accepting illicit funds from his father. Since then, Mr. Murray has lived a completely law-abiding life. Today, he is focusing all of his energy and efforts on his family and career at Dakota Mill & Grain, Inc. In addition, Mr. Murray's family, friends, co-workers, and employer are all aware of his charges and continue to support him. Mr. Murray hopes the Court sees that he is truly committed to bettering himself and never reoffending again.

As further proof of the near-nonexistent risk of Mr. Murray reoffending, he has religiously observed his conditions of pretrial release pending disposition of this matter and reported to his pretrial supervision officer without fail. See United States v. Munoz-Nava 524 F.3d 1137 (10th Cir. 2008) (finding district court's sentence of one year and one day in prison, plus one year of home detention, reasonable in drug case where guidelines were 47–56 months, partly because the defendant's "exemplary behavior" while on pretrial release for a year-and-a-half showed the defendant was unlikely to reoffend). Mr. Murray respectfully requests that the Court, when fashioning his sentence, consider that he poses no risk of reoffending.

14

**E.      THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES**

Under 18 U.S.C. § 3553(a)(6), sentencing courts must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Data collected from money laundering cases within the Southern District of Florida, along with a comparison of Mr. Murray's role in the offense relative to his father Troy, demonstrate that a downward variance in this case would not lead to unwarranted sentence disparities for similarly situated defendants.

**1.   The Distribution of Money Laundering Sentences in the Southern District of Florida**

An analysis of the average distribution of sentence lengths imposed on defendants convicted of money laundering offenses in the Southern District of Florida evidences that a downward variance from the advisory guideline range would not only be reasonable, but also in line with general sentencing practices in this District. The Sentencing Commission's "Interactive Data Analyzer" indicates that, between 2015 and 2024, there were five-hundred-and-thirty-seven (537) reported money laundering cases in this District where defendants had a criminal history category of I (results reproduced below). Approximately 44.3% percent of defendants received sentences less than two (2) years in length, with an additional 35.6% of defendants receiving sentences between two (2) and five (5) years in length. It is important to note that these figures include sentencing outcomes for all money laundering-related cases, not only those in which a downward variance was granted.



**Distribution of Sentence Length**
Fiscal Year 2015,2016,2017,2018,2019,2020,2021,2022,2023,2024

Less than 2 years 44.3%

2 to less than 5 years 35.6%

5 to less than 10 years 14.9%

25 to less than 30 years 0.2%
20 to less than 25 years 0.7%
15 to less than 20 years 1.3%
10 to less than 15 years 3.0%

The figure includes the 537 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of probation only are included here as zero months.
FILTER:
Fiscal Year: 2015,2016,2017,2018,2019,2020,2021,2022,2023,2024; Circuit: All; State: All; District: Florida, Southern; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Money Laundering; Guideline: All; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status:

As such, a downward variance below Mr. Murray's recommended  advisory guidelines range of thirty-three (33) to forty-one (41) months' imprisonment would not only conform with sentencing  practices for this offense type in this District, but also with the principles enunciated in 18 U.S.C. § 3553(a)(6).

### 2.  The Hierarchy of Culpability and Mr. Murray's Minimal Role in the Offense

Although Mr. Murray did not argue for a "minor role" reduction under U.S.S.G. § 3B1.2(b) of the guidelines, he respectfully requests that the Court consider his relatively limited role and participation in the offense as grounds for a below-guidelines sentence.

Unlike his father Troy, Mr. Murray did not have a full grasp of the scope and structure of the underling Jamaican lottery fraud scheme. He did not participate in planning or organizing

16

same, and had no decision-making authority over how the lottery scheme would operate or how

Troy Murray's illicit proceeds should be laundered.

In contrast, Troy Murray:

1.  Brokered victim lead lists to the perpetrators of the
    lottery fraud from 2012 to 2023;

2.  Maintained a lead database containing information
    about more than seven (7) million people;

3.  Sold over 22,000 lead lists during his involvement in
    the lottery fraud scheme; and

4.  Earned approximately $5.2 million in profits from
    the offense.

See Draft Presentence Investigation Report at ¶ 24. (D.E. 16).

"[D]istrict judges have an obligation to consider whether to depart from the Guidelines

sentencing range or to impose a non-Guidelines sentence in every case." See Corsey, 723 F.3d at

382 (2d. Cir. 2013) (Underhill, J., concurring). Given the significant difference in the level of Mr.

Murray's culpability and involvement in the offense conduct, he respectfully submits that a

downward variance is appropriate to account for the disparity between his limited role in the

offense as compared to his father's. A below-guidelines sentence here would be sufficient—but

not greater than necessary—to satisfy the congressional directive of 18 U.S.C. § 3553(a)(6).

## F.    DETERRENCE DOES NOT REQUIRE INCARCERATION FOR MR. MURRAY

The theory of "general deterrence" as a justification for imprisonment is premised on the

idea that prospective offenders will rationally consider potential consequences before committing

a crime. However:

> [T]he high variability across types of offenders and offences, and
> lack of satisfactory evidence demonstrating offender rationality in
> practice, makes it impossible to assume all or most offenders
> rationally consider commission of a crime before committing it. The

> strongest argument against deterrence theory is the overwhelming body of evidence suggesting that humans do not make conscious, rational decisions at all times. An overview of the…theories and research surrounding irrational criminal decision-making shows that punishment as a general deterrent is ineffective.

See Athula Pathinayake, Should We Deter Against General Deterrence?, 9 Wake Forest J.L. & Pol'y 63, 88–89 (2018).

Indeed, a lengthy term of incarceration "may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." Gall 552 U.S. at 54. Alternatives to incarceration "divert offenders from the criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties." See "Sentencing Options Under the Guidelines," United States Sentencing Commission (1996)[4]; see also United States v. Adelson, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006), aff'd 301 Fed. Appx 93 (2d Cir. 2008) (stating that "even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders"). In light of these considerations, Mr. Murray asks this Court to vary below the advisory guideline range because incarceration is not necessary to deter him from committing any future crimes.

---

[4] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/working-group-reports/simplification/SENTOPT.pdf

## IV.    CONCLUSION

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate . . . the crime and the punishment to ensue." Koon v. United States, 518 U.S. 81, 113 (1996). Despite the seriousness of the offense, Mr. Murray respectfully submits that a below-guidelines sentence is appropriate, and prays that the Court recognizes his sincere remorse and commitment to never reoffending again.

Respectfully submitted,

**GRAYROBINSON, P.A.**
Attorneys for Defendant
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887
brian.bieber@gray-robinson.com
alek.ubieta@gray-robinson.com

By:    s/Brian H. Bieber
       BRIAN H. BIEBER
       Florida Bar #8140

By:    s/Alek Ubieta
       ALEK UBIETA
       Florida Bar #1039546

19

**CERTIFICATE OF SERVICE**

I **HEREBY CERTIFY** that on December 4, 2025, I electronically filed the foregoing with

the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing

to all counsel of record.

s/Brian H. Bieber
BRIAN H. BIEBER

s/Alek Ubieta
ALEK UBIETA

20